IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DINA WALKER,

    Plaintiff,

vs.                                 No. CV-08-340 RLP/ACT

SAN JUAN REGIONAL MEDICAL
CENTER, INC.,

    Defendant.

### MEMORANDUM OPINION AND ORDER

Plaintiff, a female of Hispanic, Native American and White ancestry, filed suit against Defendant ("SJRMC" herein) alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e [1] and the New Mexico Human Rights Act, N.M. Stat. Ann. §§ 28-1-1 to -15. She contends that she was subjected to a hostile work environment because of her race and/or national origin, and was unjustly terminated in retaliation for complaining about her treatment by her supervisor.

SJRMC moves for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Doc. 22). Plaintiff concedes that she did not exhaust her administrative remedies on the claim of retaliatory discharge. (Doc. 25, p. 8 ¶ 42; and p. 11). As such, SJRMC is entitled to Summary Judgment on that claim.[2]

---

[1] "Although hostile work environment is not explicitly mentioned in Title VII, it is well established a victim of a racially hostile or abusive work environment may bring a cause of action pursuant to 42 U.S.C. § 2000e-2(a)(1)." Bolden v. PRC Inc., 43 F.3d 545, 550 (10th Cir. 1994).

[2] Retaliatory discharge is a discrete, discriminatory action for which administrative remedies must be exhausted. See Annett v. Univ. of Kan., 371 F.3d 1233, 1238 (10th Cir.2004). Prior to her termination, Plaintiff filed an administrative charge of discrimination. She did not file a separate charge after her termination. (Undisputed Fact 42). A separate charge must be filed for discrete claims of discrimination based on incidents occurring after the filing of an EEO complaint. Martinez v. Potter, 347 F.3d, 1208, 1210 (10th Cir. 2003). Plaintiff did not exhaust her

The remaining issue before the Court is whether there is a genuine dispute over any material fact as to whether Plaintiff was subjected to a hostile work environment because of her race and/ or national origin.

**I.      Summary Judgment Standard**

Summary judgment is proper "if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law" that is "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." 19 Solid Waste Dep't Mechanics v. City of Albuquerque, 156 F.3d 1068, 1071-72 (10th Cir.1998) (internal citations and quotations omitted). When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in her favor. Simms v. Oklahoma ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir.1999).

At the summary judgment stage the Court's function is not to weigh the evidence, but to determine whether there is a genuine issue of material fact for trial. Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir.1994). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998). "The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'...." Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir.1997). "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." See Adler, 144 F.3d at 670. The nonmovant

---

administrative remedies on her claim of retaliatory discharge, and SJRMC is entitled to Summary Judgment on that claim. The Court will consider Plaintiff's allegations related to her discharge as background evidence for her hostile work environment claim. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2003).

must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. Celotex v. Catrett, 477 U.S. 317, 324 (1986) (interpreting Fed.R.Civ.P. 56(e)).

## II.     Exclusion of Plaintiff's Affidavit Testimony Regarding Racist Comments

Plaintiff submitted her affidavit to controvert certain facts set forth by SJRMC. In Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986), the Tenth Circuit Court of Appeals held that

> [C]ourts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue. . .( because) the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony.  Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain.

I find that the factors set out in Franks warrant the exclusion of Plaintiff's affidavit to the extent it is an attempt to create a sham issue of fact by describing racist comments she now attributes to her supervisor, and which she did not disclose at her deposition.   I also find that the timing of Plaintiff's affidavit, offered after the close of discovery and less then three months before trial, places SJRMC at a disadvantage, depriving it of any chance to pursue discovery on the subject of racist comments.

In her affidavit, Plaintiff contends that her supervisor, Teresa  Shull ("Ms. Shull" herein) told two off color jokes about "Mexicans" in Plaintiff's presence  and on one occasion stated that "stupid Mexican gang-bangers" were always getting shot.[3]  She does not describe these events further.  Plaintiff did not relate any racist comments being made by Ms. Shull at her lengthy

---

[3]Plaintiff does not state when any of these events occurred.  Ms. Shull was Plaintiff's supervisor for  over 6 years.  (See undisputed dates in Facts 5 and 34).

deposition[4], although she was given every opportunity to do so:

> Q: Am I correct that you're claiming in this lawsuit that you were discriminated against on the basis of your Native American race:
>
> A: And Hispanic.
>
> Q: And your Hispanic national origin?
>
> A: Yes; I am.
>
> Q: All right. Who specifically do you believe discriminated against you?
>
> A: Theresa Schoal (sic) and Beth Volkerding.
>
> Q: Okay. Anybody else?
>
> A: No.
>
> Q: And what incidents do you believe were the discrimination? And I know we talked about a lot of facts during the first day of your deposition, so if you want to answer by referring back to facts we discussed the other time, I'll understand.
>
> So, the last time we talked at length about the incidents that you believe were Ms. Schoal (sic) picking on you and bullying you, correct?
>
> A: Yes.
>
> Q: Do you remember that?
>
> A: Yes.
>
> Q: And we discussed all those incidents and all the reasons you felt that she was unfair to you or picking on you, right?
>
> A: Yes.
>
> Q: All right. Are those the incidents you're claiming were discrimination by Ms. Schoal (sic)?

---

[4]Plaintiff's deposition was taken over two days. The first session covered in excess of 266 pages of transcript. (See Doc. 23, Ex. 1). The second session was 16 pages. (See Doc. 23, Ex. 3). The testimony recited herein was given at the second session.

A: Yes.

\*\*\*

Q: Okay. You recall the last time we discussed all the reasons why you believed that the incidents of Ms. Schoal (sic) picking on you were unfair and offensive; do you recall that?

A: Yes.

Q: Okay. Are those the same reasons why you believe she discriminated against you on the basis of your race and national origin.

A: Yes, I do.

Q: All right. Do you have any more facts to support that allegation that you haven't told me about last time?

A: I found more documentation going through all my stuff.

Q: Okay. What kind of documentation.

A: I–more that – more treatment, that she treated me bad.

Q: Are the documents notes that you took to yourself?

A: Yes.

Q: All right. Are they more incidents that you believe where Ms. Schoal (sic) was picking on you or bullying you?

A: Yes.

Q: All right. I will asked that those be provided to me. But as you sit here today, other than what's in those documents, do you have any additional facts you didn't tell me about last time to support your claim that it was discrimination on the basis of your race or national origin?

A: I can't think of anything else but discrimination. I just can't.

Q: Okay. For the reasons you described last time?

A: Yes.

(Depo. Walker, Doc. 23, Ex. 3, p. 9 line 9 through p. 12, line 17).

Plaintiff attempts to explain her failure to disclose the three comments she now claims were

5

made by Ms. Shull by stating that she was "nervous, intimidated and afraid" at her deposition. (Doc. 25, Affidavit of Walker, ¶12). Examining the extended portions of the deposition before me, I find no indication of nervousness, intimidation or fear, nor does Plaintiff point to any passage of her deposition which would indicate that she was suffering under any such impediment. Plaintiff does not contend that she was confused at her deposition. She described in detail many other incidents involving Ms. Shull which she claims support her allegations of racial discrimination. Believing herself the victim of racial discrimination, she did not disclose at her deposition racial epithets she found offensive and demeaning. Plaintiff had time between the first and second sessions of her deposition to reflect on her testimony and still did not describe the incidents related for the first time in her affidavit.

**III.   Facts.**

Plaintiff was hired as a PBX/Switchboard Operator by SJRMC on September 25, 2000, and remained in that position until her termination. (Undisputed Fact 1). She is of Hispanic, Native American and white origin.[5] (Undisputed Fact 2). Plaintiff and four or five other PBX Operators reported to the PBX Supervisor. (Undisputed Fact 3). Plaintiff operated one switchboard and sat next to another PBX Operator manning the second switchboard. (Undisputed Fact 4). Ms. Shull was a PBX operator on staff when Plaintiff was hired. Ms. Shull became a PBX Supervisor in

---

[5]SJRMC's Undisputed Fact 2 states that Plaintiff "alleges that she is one-half Hispanic, one-quarter Native American and one-quarter white." In support of this Undisputed Fact SJRMC cites to Plaintiff's deposition testimony where she states that she is "about" "half Hispanic, one-quarter Ute Indian and one-quarter white." (Doc. No. 23, Ex. 1, Depo. Walker p. 21 lines 1-4). Plaintiff now disputes this fact, stating that it is Defense counsel's "generalized breakdown" of her origins, and that she "identifies with being mostly Hispanic." (Doc. No. 25, p. 2). The Court notes that three times in her Complaint Plaintiff describes herself as Native American and Hispanic. (Doc. No. 1, Introductory paragraph, ¶ 2, ¶9). In any event, Plaintiff's dispute of this fact does not create a genuine issue of material fact.

approximately August 2001, and Plaintiff began reporting directly her. (Undisputed Fact 5). Plaintiff alleges that Ms. Shull discriminated against her by "bullying" her, "picking on" her and treating her unfairly. Plaintiff described seven instances (some occurring repeatedly) of mistreatment by Ms. Shull. (Undisputed Fact 6).

**(1)     Enunciation**

On five occasions Ms. Shull told Plaintiff to practice saying "San Juan Regional Medical Center" in front of the mirror at home. This is all Ms. Shull said to Plaintiff. Plaintiff interpreted Ms. Shull's remarks as "making fun of her accent." (Undisputed Fact 7). Plaintiff did have difficulty pronouncing the word "Regional" in "San Juan Regional Medical Center" due to her partial dentures. She admits that as a PBX Operator, she should have been able to say "Regional" clearly, but did not always do so. She never practiced saying "San Juan Regional Medical Center" as Ms. Shull instructed. (Undisputed Fact 7).

(**2**)     **Principal's Office**

On two occasions Ms. Shull told Plaintiff to come with her into the "principal's office," meaning the chapel, when she wanted to discuss some concern with Walker. (Undisputed Fact 8). Plaintiff felt Ms. Shull was singling her out, and never heard her speak to other employees this way. ( Docket No. 25, Affidavit of Walker,¶6).

**(3)     Paging**

Ms. Shull aggressively pointed at or tapped on the paging device and told Plaintiff to use the personal pagers when Plaintiff incorrectly paged doctors on the public address system rather than on their personal pagers. (Undisputed Fact 9).

**(4)     Dilly-Dallying**

Ms. Shull said, "Don't be dilly-dallying around; I want you back here in five minutes" on

7

approximately five occasions when Plaintiff left her work station temporarily. (Undisputed Fact 10).

### (5) Personal calls

On one occasion Ms. Shull told Plaintiff not to conduct personal business on the hospital telephone when Plaintiff was talking to her personal realtor while operating the switchboard. (Undisputed Fact 11).

### (6) Visiting relatives

Ms. Shull yelled at Plaintiff to get back to work on two occasions when Plaintiff got up from her switchboard to chat with visiting relatives. (Undisputed Fact 12).

### (7) Screaming

Ms. Shull screamed at Plaintiff, "Where the hell have you been; you've been gone for forty minutes" on one occasion when Plaintiff returned to her station after leaving for thirty to forty-five minutes during her shift to speak with the Human Resources Manager. (Undisputed Fact 13).

These interactions with Ms. Shull were in plain view of other employees, which Plaintiff found very humiliating. (Doc. 25, Affidavit of Walker, ¶ 9).

In describing these seven instances of unfair treatment by Ms. Shull at her deposition, Plaintiff never described Shull's conduct or statements as being discriminatory on the basis of race or national origin. (Undisputed Fact 14). Although Plaintiff disputes this fact, she did not cite to any testimony at her deposition where she described Ms. Shull's actions as racially discriminatory. Rather, she states that she was "nervous, intimidated and afraid" at her deposition as an explanation for not ascribing race or national origin animus to Ms. Shull's actions. (Doc. 25, p. 4)

None of Ms. Shull's alleged mistreatment resulted in any disciplinary action against

Plaintiff.[6] (Undisputed Fact 17).  Plaintiff does not deny that she received no warnings or discipline for the events described.  Rather, she maintains that the was fired after being subjected to harsh and discriminatory treatment by Ms. Shull. (Doc. No. 25, p. 4).

Sometime before August 2006 Plaintiff complained to SJRMC's Human Resources Manager, Elizabeth Volkerding that Ms. Shull was picking on her and treating her unfairly.  (Undisputed Fact 18).

Plaintiff complained to Ms. Volkerding a second time in 2006 or 2007.  She told Ms. Volkerding that Ms. Shull's "harassment" and "bullying" had not stopped since her last complaint. (Undisputed Fact 19).

Plaintiff contends in her affidavit that she is sure she mentioned to Ms. Volkerding on at least one occasion that she thought Ms. Shull treated her differently because she was a Mexican.  (Doc. No. 25, p. 4-5; and Affidavit of Walker ¶ 14).   She provides no date for this conversation with Ms. Volkerding.  When she was asked about her conversations with Ms. Volkerding at her deposition, however, she did not indicate that she told Ms. Volkerding she felt she was treated differently

---

[6]Plaintiff was not given a written warning for not practicing in front of the mirror (Doc. No. 23, Depo. Walker, p. 117, lines 7-16);  Plaintiff was not given a warning for paging doctors incorrectly.  (Doc. No. 23, Depo. Walker, p. 117, lines 17-19); Plaintiff was never disciplined or given a warning for spending too much time away from the switchboard.  (Doc. No. 23, Depo. Walker, p.127, lines 10-13); Plaintiff was never disciplined or given a warning in connection with the occasions she was called into the "principal's office."  (Doc. No. 23, Depo. Walker, p.127, lines 14-18);  Plaintiff's was never disciplined or given a formal warning about conducting personal business over the telephone, other than being told not to do so.  (Doc. No. 23, Depo. Walker, p.131, lines 7-12);  Plaintiff was never disciplined or given a written warning for visiting with her relatives during her shift.   (Doc. No. 23, Depo. Walker, p.131 line 24 - p. 132 line 2); Plaintiff was not formally disciplined or given a written discipline when in connection with the screaming episode. (Doc. No. 23, Depo. Walker, p.139, lines 2-10).

because of her race or national origin.[7]

On August 8, 2007, Plaintiff filed a written complaint about Ms. Shull's alleged "bullying" on Quatros, SJRMC's electronic incident reporting system. This was her first written complaint about Ms. Shull. Her Quatros complaint did not suggest that Ms. Shull's alleged conduct was discriminatory on the basis of race or national origin. (Undisputed Fact 20). In her Affidavit, Plaintiff states that she was worried about retaliation if she included claims of race discrimination in her Quatros report. (Doc. 25, Affidavit Walker, ¶15)

Catherine Zaharko, Vice President of Marketing and Ms. Shull's supervisor, investigated Plaintiff's August 8, 2007 Quatros complaint. Partly as a result of her investigation, Ms. Zaharko placed Ms. Shull on an action plan to address ongoing deficiencies in her management and communication skills. However, Mr. Zaharko did not find or have any reason to suspect that Ms. Shull had discriminated against Plaintiff on the basis of her race or national origin. (Undisputed Fact 21).

On August 17, 2007, Ms. Shull gave Plaintiff a written counseling for a no-call/no-show

---

[7] Q: Tell me as best you can recall everything you said (to Ms. Volkerding).
A: Oh, God. That was a long time ago. That Teresa just picked on me and I wasn't being treated fairly; that she would treat everybody else different. I wasn't allowed to do anything.
Q: Okay. And did you talk about the specifics of some of the incidents that we've talked about today?
A: I don't remember.
Q: Okay. Do you recall anything else you said during that meeting?
A: No. I just cried a lot.
Q: Okay. Was there anything specific you were asking to be done?
A: I just wanted her to stop, and treat me like a person, an equal, and with respect. (Doc. No. 23, Depo. Walker, p. 163 line 15 to p. 164 line 5).

after Plaintiff missed two scheduled shifts.[8] Plaintiff admitted that all of the facts in the counseling form were true: That she had originally agreed to work two shifts on consecutive weekend days to cover for an absent worker, but then requested to have those days off to attend a family reunion. Ms. Shull denied that request because no one else was available to work the shifts. Plaintiff then had her husband call in sick for her and missed both shifts. (Undisputed Fact 23).

Plaintiff protested the August 17 counseling by filing a complaint under SJRMC's Fair Treatment Procedure. (Undisputed Fact 25). The Fair Treatment Procedure provides for review and potential reversal of a disciplinary action by the employee's immediate supervisor, then by the department head, then by a Fair Treatment Committee. Three of the Fair Treatment Committee's five voting members are selected by the employee. (Undisputed Fact 26). Plaintiff asserted during the Fair Treatment Procedure that the counseling for a no-call/no-show was unfair because she truly was sick, she did not go to the reunion, and it was the first time she had ever called in sick for a graveyard shift. (Undisputed Fact 27). Ms. Shull and Ms. Zaharko upheld the August 17 counseling at Steps 2 and 3 of the Fair Treatment Procedure. On September 28, 2007, the Fair Treatment Committee voted to uphold the action. (Undisputed Fact 28). Plaintiff is not claiming that the August 17 counseling or the upholding of that counseling in the Fair Treatment Procedure constituted discrimination of the basis of her race or national origin. (Undisputed Fact 29).

On September 13, 2007, Plaintiff filed a charge of discrimination against SJRMC with the

---

[8]SJRMC states that "According to (it's) established practice, if an employee's request to take a shift off was denied and the employee then called in sick for that shift the employee was assessed a no-call/no-show under the attendance policy, regardless of whether the employee had a doctor's excuse for the absence," citing to the Affidavit of Elizabeth Volkerding. (Doc. 23, p. 6 ¶ 24, and Volkerding Affidavit, Doc. 23, Ex. 4, ¶5). Plaintiff denies this fact, contending without citation to the record that there is no proof of this policy. (Doc. 25, p. 6, ¶24). Because Plaintiff is not claiming any discrimination as a result of the August 17 counseling and/or vote of the Fair Treatment Committee to uphold the counseling, this dispute is not material.

11

Equal Employment Opportunity Commission ("EEOC" herein), alleging retaliation and discrimination on the basis of race and national origin. (Undisputed Fact 30).

On November 24, 2007, Plaintiff asked the Management Resource Nurse, Linda Scribner, to come to the switchboard area where Plaintiff was having an altercation with Susan Roeber, a Caucasian PBX operator. When Ms. Scribner arrived Plaintiff and Ms. Roeber were arguing and yelling at each other so loudly that Ms. Scribner could hear them through a closed door. Ms. Scribner intervened to stop the altercation. She then sent Plaintiff home because her shift was ending, while Ms. Roeber's had just begun. Ms. Shull was out of town at the time of this incident. (Undisputed Fact 31).

Both Plaintiff and Ms. Roeber were directed to fill out Quatros reports on the November 24 incident. According to Ms. Roeber's report, Plaintiff threw her switchboard and portable DVD player at Ms. Roeber and started screaming at her about putting on makeup at work. (Undisputed Fact 32). Plaintiff admits that this is what Ms. Roeber stated in her Quatros report. She contends that Ms. Roeber's reporting was not accurate. (Doc. 25 p. 7, and affidavit of Walker ¶16). Plaintiff alleged in her Quatros report that Ms. Roeber was putting on makeup at her work station and threw a phone handset at Plaintiff first. Plaintiff admits that she threw the handset back at Ms. Roeber and said "F.U." to her. (Undisputed Fact 33).

Both Plaintiff and Ms. Roeber were terminated effective November 29. (Undisputed Fact 34). The terminations were for repeated violations of SJRMC's Professional Conduct Guidelines.[9]

---

[9]Ms. Zaharko's affidavit states in relevant part:

7.    After reviewing the Quatros reports and obtaining additional information from Linda Scribner, I decided to terminate Ms. Walker and Ms. Roeber effective November 29, 2007 for repeated violations of SJRMC's Professional Conduct Guidelines. Both employees had previous documented

(Undisputed Fact 34)[10]. Plaintiff had received and signed for a copy of the Professional Conduct Guidelines on June 17, 2003. (Undisputed Fact 35). The Professional Conduct Guidelines require, among other things, that SJRMC employees treat each other respectfully and refrain from throwing objects or using profane, degrading or intimidating language in the workplace. (Undisputed Fact 36). Plaintiff admitted at her deposition that an employee's cursing or throwing objects at a coworker would violate the Professional Conduct Guidelines. (Undisputed Fact 37). Both Plaintiff and Ms. Roeber received previous documented warnings for unprofessional conduct. (Undisputed Fact 38).

Plaintiff contends she was terminated after she endured hostile, discriminatory treatment from Ms. Shull, and had voiced her concerns orally and in writing. (Doc. 25, p.8). Nonetheless, she does not claim that Ms. Zaharko discriminated against her on the basis of her race or national origin. She has no reason to believe that Ms. Zaharko would discriminate against her. (Undisputed Fact 41).

Citing to her affidavit, Plaintiff states that :

> warnings for violation of the Guidelines. True copies of their previous warnings are attached hereto as Exhibit B.
>
> 8.   I signed termination notices for Ms. Walker and Ms. Roeber on November 28, 2007. True copies of those notices are attached hereto as Exhibit C. I decided to terminate Ms. Walker and Ms. Roeber for the reasons stated in the notices.

(Doc. 23, Ex. 6).

---

[10]Plaintiff attempted to dispute this fact by stating, without citation to the record, her contention that she was "dismissed as a direct and proximate result of retaliation and discrimination against her." (Doc. 25, p. 7). "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir.1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).

      a)      Ms. Shull often insulted her intelligence, and spoke to her in a way that conveyed she did not know how to do her job, never offered any constructive criticism, and didn't treat others in this way. (Doc. 25, p. 9 & Affidavit of Walker ¶ 7)

      b)      Ms. Shull would often point and aggressively correct Plaintiff and Plaintiff never saw her treat another employee this way. (Doc. 25, p. 9 & Affidavit of Walker ¶ 8).

      c)      Plaintiff was the only identifiably Hispanic subordinate of Ms. Shull. Another individual who may be of Hispanic origin is much lighter skinned and looks Anglo. (Doc. 25, p. 10, & Affidavit of Walker ¶13).

**IV.  Discussion**

Because Plaintiff's burden of establishing a *prima facie* case under the New Mexico Human Rights Act, NMSA is identical to her burden under Title VII, analysis of the federal law applies equally to her state-law claim. Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n. 5 (10th Cir. 2005), See Cates v. Regents of the New Mexico Institute of Mining & Technology, 124 N.M. 633, 954 P.2d 65, 70 (N.M.1998).

    **A.  Hostile Work Environment**

A hostile work environment is composed of a series of separate acts that collectively constitute one "unlawful employment practice." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002) (citing 42 U.S.C. §2000e-5(e)(1)).

To determine whether plaintiff has established a *prima facie* case of hostile work environment courts "look to all the circumstances, to see if the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the plaintiff's employment, and if the plaintiff was subjected to this abusive environment because of her [protected class]." Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1169-

1170 (10th Cir. 2007) (quotations, citation and alterations omitted.).

In assessing severity and pervasiveness, the court evaluates the totality of the circumstances, "considering such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Chavez v. New Mexico, 397 F.3d 826, 832 (10th Cir.2005) (citation and quotation omitted). In addition, courts are to be mindful of the Supreme Court's admonition that they should "filter out complaints attacking the ordinary tribulations of the workplace." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).

> Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment..., Meritor (Sav. Bank, FSB v. Vinson) , 477 U.S. 57, 67, 106 S.Ct. at 2405-06, and (2) the harassment was racial or stemmed from racial animus. General harassment if not racial or sexual is not actionable. The plaintiff must show " 'more than a few isolated incidents of racial enmity.' " Hicks v. Gates Rubber Co., 833 F.2d 1406, 1412 (10th Cir. 1987) (quoting Snell v. Suffolk Co., 782 F.2d 1094, 1103 (2d Cir.1986)). Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Id. at 1412-13 (citing Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir.1981)).

Bolden v. PRC Inc., 43 F.3d 545, 551 (10th Cir. 1994).

Additionally a plaintiff must produce evidence that a reasonable person would find that the work environment was hostile or abusive, and that she subjectively perceived the environment to be abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Smith v. Northwest Financial Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir.1997). A plaintiff must do more than demonstrate a few isolated incidents of enmity or sporadic slurs. See Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir.2007). Instead, there must be a steady barrage of such incidents. See id.

    **B.**    **The Circumstances of Plaintiff's Termination as Evidence of Hostile Work Environment**.

Plaintiff appears to argue that her termination was in retaliation for her complaints against

Ms. Shull, and is therefore evidence of a hostile work environment.(Docket No. 25, p. 11).

To establish a *prima facie* case of retaliation, a plaintiff must prove: "(1) she engaged in a protected activity; (2) the defendant took adverse action against her; and (3) a causal connection existed between the protected activity and the adverse employment activity." See Meredith v. Beech Aircraft Corp., 18 F.3d 890, 896 (10th Cir.1994); Purrington v. Univ. of Utah, 996 F.2d 1025, 1033 (10th Cir.1993). If a plaintiff establishes a *prima facie* case, the burden of production shifts, and the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action. "Once defendant has dispelled the inference of retaliation by establishing a legitimate reason, 'the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination.'" Purrington, 996 F.2d at 1033 (quoting Anderson v. Phillips Petroleum Co., 861 F.2d 631, 634 (10th Cir.1988)); see also Goodwin v. General Motors Corp., 275 F.3d 1005, 1012 (10th Cir.2002) (At summary judgment stage, once defendant has offered a facially non-discriminatory reason for its employment decision, plaintiff has the burden to show there is a genuine dispute of material fact as to whether the employer acted with discriminatory motive or intent or its proffered reason for the challenged activity is pretextual-i.e., unworthy of belief).  "Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' " Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997) (citations omitted).

Granting that Plaintiff was engaged in a protected activity when she complained about Ms. Shull and when she filed her EEO complaint, she has failed to show a causal connection between that protected activity and her termination, and has failed to offer any evidence that SJRMC's reason

for terminating her was pretextual. It is undisputed that Ms. Zaharko, whom Plaintiff concedes did not discriminate against her on the basis of race or national origin, made the ultimate decision to terminate Plaintiff's employment; that this decision was reached following conduct by Plaintiff that violated SJRMC's Professional Conduct Guidelines, and that Plaintiff had a prior incident of documented unprofessional conduct.

### C. Racist Comments.

The Court has already determined that Plaintiff's affidavit describing three race related comments attributed to Ms. Shull should be disregarded. Even if those comments were considered along with Plaintiff's contention that she assumed Ms. Shull was making fun of her accent asking her to practice speaking the word "regional," Plaintiff has failed to establish a *prima facie* case of hostile work environment. Asking an employee to practice enunciating a word she had to use in her job, and she admits she had difficulty speaking, is not objectively abusive. Even assuming the two race related jokes and one other race related comment made by Ms. Shull were offensive to Plaintiff, they amount to a few isolated incidents of enmity or sporadic slurs, not a steady barrage of such incidents.

### D. Other Acts.

The other acts Plaintiff points to as constituting abusive and harassing conduct tending to create a racially hostile work environment have no racial nexus whatsoever. Supervision, even aggressive and unfriendly supervision, does not equate to harassment. When the nature of an employee's environment, however unpleasant, is not due to her race or national origin, she has not been the victim of race or national origin discrimination as a result of that environment. Stahl v. Sun Microsystems, Inc., 19 F.3d 533, 538 (10th Cir.1994).

## V.     Conclusion

The Court concludes that Plaintiff failed to exhaust her administrative remedies with regard to her claim of retaliatory discharge, and there is no genuine dispute over any material fact as to whether Plaintiff was subjected to a hostile work environment because of her race and/ or national origin.  Therefore,  SJRMC is entitled to summary judgment in its favor.

**WHEREFORE**,

**IT IS ORDERED** that Defendant SJRMC's Motion for Summary Judgment (Docket No. 23) is **GRANTED.**

**IT IS FURTHER ORDERED** that this civil proceeding is **DISMISSED WITH PREJUDICE.**

_____
Hon. Richard L. Puglisi
United States Magistrate Judge